IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
|      Plaintiff, | ) |
| | ) |
| vs. | ) No. 4:10 CR 230 RWS (FRB) |
| | ) |
| RUSSELL GENDRON | ) |
| | ) |
|      Defendant. | ) |

## DEFENDANT'S SUPPLEMENT TO THE MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

Defendant Russell Gendron, through his attorney Diane L. Dragan, Assistant Federal Public Defender, moves this Court for an order suppressing all evidence and statements based on a coerced and involuntary consent to search.  In support of this Motion Mr. Gendron states the following:

**Facts**

On August 11, 2007, nearly three years ago, an employee at Dierberg's grocery store located a notebook in the employee locker room.  The notebook contained handwritten snippets of stories involving incest fantasies.  The employee gave the notebook to a supervisor and the police were called.  The notebook was identified as belonging to Mr. Gendron.  The notebook itself contained nothing illegal and Mr. Gendron is not charged with any crime in relation to the notebook.

On August 15, 2007, officers with the St. Louis County Police Department arrived at the grocery store, Mr. Gendron's place of work, after determining he was on shift and spoke with the store manager.  At some point between 6:30 pm and 7:00 pm, officers requested that the manager bring Mr. Gendron to a private office in the back of the store so that they could speak with him.  Mr.

Gendron was still on the clock at the time he was brought to the office.  The store manager informed Mr. Gendron that he would still be paid for his shift while talking to the officers.  (Suppression Hearing Transcript, Nov. 6, 2008, p. 10)(Hereinafter S.H. I).  Mr. Gendron was left alone in the back office, door closed, with Detective Brillos.  This was a 10 by 15 foot office.  *Id.* at p. 9.  He was not read his *Miranda* rights.  The detective questioned Mr. Gendron about the notebook and he admitted it was his.

With nothing more than an admission to possession of a handwritten notebook, Detective Brillos began questioning Mr. Gendron about whether he owned a computer in his home.  Detective Brillos had not done any prior investigation to determine whether or not Mr. Gendron had Internet access in his home.  (S.H. I, p. 35).  When Mr. Gendron confirmed owning a computer, the detective took him from his place of work, in a police vehicle, to his home.  The officers had neither an arrest warrant or a search warrant at the time. *Id.* at p. 40. Still absent any mention of Mr. Gendron's *Miranda* rights, or the reason for the request, officers alleged that at approximately 8:00 p.m. that evening, nearly an hour and a half after first speaking with him, they obtained consent to search his home.  Brillos testified the consent was signed in the presence of the other officers including Kavanaugh outside of the house in the driveway or on the hood of his car.  *Id.* at p. 46.

The accounts of what occurred when the officers arrived at Mr. Gendron's residence vary dramatically.  The evidence is uncontested the officers arrived at the home at approximately 8:00 pm.  Brillos denied having any conversation in the ride over with Russell Gendron regarding what the officers were going to tell his family members regarding their presence in the home. (S.H. I, p. 45) He specifically denied having a conversation where the officer agreed not to mention child pornography.  *Id.* at p. 45-46.   The officers denied doing a "protective sweep" of the house but

2

claimed upon entering the home that Mr. Gendron "gathered everyone" at the dining room and gave them an explanation of why the officers were in the home. *Id.* at p. 23-24, 47. Detective Brillos testified he did not think Mr. Gendron had accurately explained why they were there so he felt "obligated to inform them that we were in their house on a voluntary basis and the fact that I had an ongoing investigation and the fact that I was going to request their consent to search their computers for child pornography." *Id.* at p. 24, 48-49.

Brillos testified that everyone was "pleasant and cooperative an all voluntarily gave consent, excluding a brief pause by David". (S.H. I, p. 26) He indicated David had some questions he wanted to ask and that he requested to "be away from the other adults" and that he wanted "privacy" so Brillos accommodated his requests. *Id.* at p. 26. After answering the questions, David is alleged to have signed the consent. *Id.* at p. 26. Brillos indicated these questions took "a minute or two" and that everyone in the house signed the consents within the first 30 minutes. *Id.* at p. 51-52.

When asked about Jamie Gendron, Brillos indicated he had some questions because they did not understand what was going on which was "why I felt that an accurate description of why we were there was needed." (S.H. I p. 50). Brillos indicated that Mr. Russell Gendron voluntarily signed the consent. He admitted before the consent was signed, Brillos had already been in Russell's bedroom and physically handled all of the computer equipment, recorded the serial numbers, etc. before the form was presented to Gendron for his signature. *Id.* at p. 60. When asked what happened after Russell Gendron signed his consent, he testified that after the defendant consented to the search it was "at that time some items were discovered on another computer in the residence" and that "subject [David] was placed under arrest." *Id.* at p. 32. He indicated the child pornography was found on David's computer within the first hour and once located they immediately called the

Evidence Technician Unit to seize the equipment.  (S.H. I, p. 52-53).  When questioned about the fact the reports show the unit was not called out until 11:10 p.m., Brillos indicated the report did not refresh his recollection on the times.  *Id.* at p. 53.  He also denied remembering what time officers ultimately left the house that evening.  *Id.* at p. 55.  During the entire time the officers were in the house, Brillos admitted the family was under constant police observation.  *Id.* at p. 54.  According to Brillos, after David's arrest, Russell Gendron was asked to voluntarily accompany the officers to the police station and agreed.  *Id.* at p. 33.

Seargent Kavanaugh also testified at the first suppression hearing.  Despite Brillos testimony to the contrary, Kavanaugh testified he did not see Mr. Gendron sign the consent to go into the house but that he was at some point shown a signed consent by Brillos.  (S.H. I, p. 82).  Kavanaugh also denied walking through the house and checking the bedrooms after they entered.  *Id.* at p. 83.  He indicated that when he walked into the home around 8:00 p.m., Brillos was in the process of having Mr. Gendron explain to the other family members why the officers were there and requesting consent to search their computers.  *Id.* at p. 66, 71.  Cavanaugh concurred with Brillos and indicated that after Mr. Gendron gave an inadequate explanation that Brillos told the entire family they were present to look for child pornography.  *Id.* at p. 84.  Cavanaugh claimed all the consent forms were signed within 15 minutes or so and signed close together.  *Id.*

Cavanaugh denied ever making a threat that if the consents were not signed, a warrant would be obtained.  (S.H. I., p. 85-86).  Cavanaugh denied speaking with or interviewing any of the residents at the home with the exception of Jamie's girlfriend.  *Id.* at p. 66.  He also denied actually witnessing Russell Gendron sign a consent for the removal of the computers from the house.  *Id.* at p. 92.  Finally, he denied that David Gendron was handcuffed and removed from the house, a fact

that all of the other witnesses were clear about including Brillos. *Id.* at p. 99.

Both Jamie's and David's testimony differed dramatically from the officers on several key points. First, Jamie testified he first encountered officers when he opened his bedroom door and found three officers in the hall wearing firearms. (S.H. I, p. 102). The officers immediately inquired who else was in the bedroom before they continued down the hall. *Id.* Jamie was then instructed to go to the dining room and sit down. *Id.* Jamie stated he immediately asked to see both a badge and a warrant. *Id.* at p. 103. He was shown a badge and told a warrant was not necessary because his father gave them permission to enter. *Id.* at p. 103-04. Jamie testified that Kavanaugh was the one running the show and told them all they wanted to search the computers in the house but that they refused to tell them why. *Id.* at p. 104. When Jamie continued to ask what they were looking for, he stated that they "went up and back and up and back. They were very nice in telling me what they did not want to search for. They did not want to search for pirated software. They did not want to search for illegally downloaded MP3's. What it actually was was left up to my imagination. I honestly thought they were some sort of Homeland Security task force looking for some weird like denial of service software that had been uploaded onto our machines". *Id.* at p. 106.

Jamie described how both sides became antagonized and annoyed. (S.H. I, p. 107). The police because they would not sign, the siblings because they would not tell them what they wanted to search for. *Id.* Eventually, he said his girlfriend Allie finished putting the kids to bed and signed her consent and the officers went off to her computer. *Id.* at p. 108. He described how Kavanaugh kept pushing to get them to sign the consent and how he tried very poorly to assuage their fears and convince them to sign, all the while refusing to explain what they were looking for. *Id.* He described the officers as exerting a lot of pressure to get the signatures. *Id.* at p. 124. Jamie

indicated as the officer's frustration increased, that Kavanaugh finally had enough and yelled to the other officers, "Fine, we'll just get a fucking warrant, bag up all the computers and take them out of here." *Id.* at p. 109, 134. It was only after Kavanaugh threatened to get a warrant and seize all the computers in the house that Jamie finally signed the consent to search because he did not want his computers seized. *Id.* at p. 109-110. He believed approximately an hour and a half had passed from the time the officers entered to his signature. *Id.* at p. 125. After this threat, David was taken into a back room with the officers because he still had not signed his consent. *Id.* at p. 111. Jamie said after David came out of the back room he seemed very dejected and hopeless and ultimately signed the form. *Id.* at p. 114.

Jamie believed the officer first checked his computer and after determining it was clean of child pornography, they then checked David and Russell's computers. (S.H. I, p. 115). Jamie indicated that during the entire time the officers were in the house, there was always a "guard" watching them. *Id.* at p. 112. Jamie repeatedly indicated he never saw his father sign a consent form. *Id.* at p. 110. He also never heard his father give verbal consent for the search or removal of the computers. *Id.* at p. 118. After David was handcuffed and taken out of the house, Jamie heard the officers tell his father they wanted him to come down to the station to answer some questions. *Id.* at p. 119. Jamie testified the officers did not appear to give his father a choice. *Id.*

David Gendron did not testify at the initial suppression hearing as he was also under Indictment at the time. Since the initial hearing, David has plead guilty to receipt of child pornography and been sentenced. David has also signed a proffer agreement with the government and agreed to testify at Russell Gendron's trial if necessary. David has remained in local custody awaiting Russell's trial since his initial detention. David testified pursuant to a defense subpeona

at the second suppression hearing.  David's testimony was similar to Jamie's in many ways.

David testified he was in his room when officers appeared at his bedroom door.  (Suppression Hearing Transcript, July 2, 2010, p. 6)(Hereinafter S.H. II).  Officers requested he come out of his room and sit at the dining room table.  *Id.* at p. 7.  His memory of some of the specifics was a little unclear as it had been almost three years between the search and his testimony.  *Id.* at p. 8, 33. David, like Jamie, described how the officers refused to tell them what it was they wanted to search for on the computers.  *Id.* at p. 11-12.  The officers refusal to explain and evasiveness in answering questions put David's "hackles up" and left him uncooperative.  *Id.* at p. 12-13.  David indicated it was "at least a couple hours" that the officers asked for him to sign the consent and he continued to refuse.  *Id.* at p. 14.  He testified that the officers were "doing their best to be intimidating" and that they were persistent in requesting the consents signed.  *Id.* at p. 34.  David testified that at one point when the officers became frustrated and exasperated, they mentioned "getting up or waking up a judge and getting him to come in, come in to sign a search warrant and — and told me I didn't want to have that happen."  *Id.* at p. 14-15.  The officers told him if they had to get a warrant, they would "take every piece of electronics in the building" which he understood to include everything from my computers to video game consoles to anything."  *Id.* at p. 16.  David indicated he was taken to one of the back bedrooms at the officer's request, because the officer wanted to talk to him and not because he wanted privacy.  *Id.* at p. 14.  David testified that he felt that if he had simply left his home, when he returned his computers would have been removed without his consent.  *Id.* at p. 20. He stated that he did not feel he had any alternative that would allow him to remain in the house and keep his computers without signing the consent.  *Id.* at p. 34.  David testified his "impression was that one way or another, whether I signed the consent form or they went and got a search warrant,

7

they weren't leaving until they got what they wanted." *Id.* at p. 35. He felt his father had the exact same impression. *Id.*

David also repeatedly denied witnessing his father sign any consent forms. (S.H. II, p. 18). He also described how the officers prevented anyone from moving around much and tried to keep control of them. *Id.* at p. 19-20. David denied requesting to speak to officers privately and indicated there "were no questions that I had that I didn't want– didn't have any problem with asking openly." *Id.* at p. 26.

On the evening of the search, Brillos engaged in several tape recorded statements with David. The first statement occurred at the house. A copy of the recording has been provided to the court as an exhibit to the recent suppression hearing. A review of the recording, strongly supports David and Jamie's testimony and directly refutes that of the two testifying officers. The officers assertions that David's consent was signed within fifteen to thirty minutes is refuted by the tape itself and the times established in the reports. All parties agree the officers entered the home at or slightly before 8:00 p.m. The first recorded statement of David starts at 10:23 p.m. in Jamie's bedroom, almost two and a half hours after the officers arrived. It is apparent from listening to the first three minutes that David had just signed the consent form and that Brillos had spent the previous hours trying to convince David to sign it.[1] That is also consistent with the timeline identified in the reports. Brillos testified the evidence technicians were called out after David's computer was discovered to contain child pornography. They were called at 11:20 p.m. Kavanaugh indicated the search of the computers with the software would take a little more than five minutes to boot up and then begin the search. (S.H. I, p. 91). There is no explanation given by the officers for what other activities may

---

[1]WS_20001 at 2:45 Detective Brillos says the "form you just signed".

8

have occurred between 8:00 p.m. when they arrived and 11:20 p.m. when they called for removal of the equipment.

Both officers denied threatening the parties with a search warrant.  This is also inconsistent with the recording.  When Brillos asks David if he had agreed to the search of the computers the first thing David discusses is that he signed the consent and that he had done so because of his understanding that "most likely based on the evidence already acquired from computers that weren't mine that a search warrant was rather likely due to have been issued".(WS-20001 at 2:53-3:10) Brillos immediately attempt to qualify David's statement that he in essence only signed because a warrant was imminent by telling David he has not yet acquired a search warrant or stated affirmatively that he is getting a search warrant for the computer.  He acknowledges some "hypothetical conversations" the two had regarding search warrants.  However the officers failed to record the prior two and a half hours worth of discussions that purportedly culminated in a "consensual" signing of forms.  Only after these consents were obtained did the officers bring out the recording equipment they had with them all along.

Additionally, the weak assurance by Brillos that no actual warrant was applied for is of little use at that time as his  questioning moves on from there and the search of his computer quickly turned up the child pornography.  Brillos did not directly refute David's statement but simply stated a warrant had not been applied for, not that he did not have the ability to apply for one if David denied consent.  Brillos denial at the suppression hearing that there was any mention of obtaining a search warrant is clearly false.  As was his assertion that David simply had a few questions and then signed after a couple of minutes.  The statements testified to by both Brillos and Kavanaugh are entirely unsupported by their own recording and significantly impact their credibility.

9

Additionally, the officers both testified that upon entering the house they were abundantly clear with all the adults that they were present to search for child pornography.  Both Jamie and David adamantly deny this account.  Neither has anything to gain from stating the officers refused to be up front and honest with them.  In fact, David puts his opportunity for a favorable departure motion from the government in jeopardy by his testimony which directly contradicted the officers should the government believe him to be lying rather than the officers.  However, a review of David's tape recording also seems to support the siblings testimony that they were not informed of the purpose of the search.  At the very end of the interview near 3:41 a.m., David still seems unclear of the source of the investigation.  It is at that point he inquires of Brillos about what initiated the investigation and what agency it began out of and in response Brillos states "Your dad was uncomfortable with informing his adult children about the reasons for our being there so at his request we limited any information that we were going to pass on to you which is why I was not answering any of your alls questions and saying I can't answer that because he did not want you to know and I respected the fact that I was not going to tell you, at his request of course." (WS_20004 1:39:10) This directly contradicts Brillos testimony when he denied having that very conversation with Gendron on the ride to the house.  (S.H. I, p. 45).  It also directly contradicts his repeated assertions to the court that he felt compelled to be honest and up front from the beginning that they were in the house to look for child pornography.  *Id.* at p. 24, 48-49.  It in fact appears that after approximately eight continuous hours in police presence and after giving a full confession to the possession of child pornography, David still is in the dark how the officers got to his house in the first place.  It is not until that point that Brillos explains he had been evasive at the direction of Gendron and had agreed to not tell them the purpose of the search was for child pornography.  Why

10

he chose to tell the court a different story is unclear.

The search of Mr. Gendron's computer in the home did not result in the discovery of any actual child pornography, although officers did observe some virtual images of pornography.  After the discovery of child pornography on David's computer, he was placed under arrest and escorted out of the home in handcuffs.  Police allege that Mr. Gendron gave verbal consent for them to seize his computer and equipment for further testing.  They did not bother to record this consent at the time it was requested. Ultimately, Mr. Gendron was taken down to police headquarters at around 1:30 a.m. and first read his *Miranda* rights at approximately 1:45 a.m.  Mr. Gendron gave a lengthy statement where he admitted to downloading virtual pornography and text stories but repeatedly denied knowingly downloading any real child pornography.  His taped interview lasted until 3:52 a.m., over nine hours after police first arrived at the grocery store.

### Memorandum in Support

The Fourth Amendment provides that the people are "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures... and no Warrants shall issue, but upon probable cause..."  U.S. Const. Amendment IV.  Detaining and questioning an individual at their place of business, in a closed manager's office, constitutes a seizure within the meaning of the Fourth Amendment, even if the purpose of the stop is limited and the detention is brief.  *See Terry v. Ohio*, 39 U.S. 1 (1968).  Absent probable cause, the police may detain someone for an investigative stop only if they have reasonable suspicion that criminal activity is afoot.  *Id.* at 21.

In this case the initial conduct of the officers began as an investigative stop.  However the only information officers had at this time was a handwritten notebook, possession of which may not be pleasing to most, but it was not unlawful.  A police officer must be able to point to specific and

11

articulable facts which taken together with rational inference would warrant an intrusion.  *Id.*  This suspicion must be more than an "inchoate and unparticularized suspicion or hunch."  *Id.* at 27.  The behavior on which the police base their reasonable suspicion need not be susceptible to only an inference of guilty, but the officers must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a "hunch" or on circumstances which describe a broad category of innocent persons.  *See Reid v. Georgia*, 448 U.S. 439, 441 (1980) and *United States v. Hawthorne*, 982 F.2d 1186, 1189 (8th Cir. 1993).  This means that before detaining an individual, officers must reasonably suspect that he is engaged in, or poised to commit a criminal act at that moment.  *Brown v. Texas*, 443 U.S. 47, 51 (1979).  Such was not the case here.  As stated above, keeping a journal or notebook of any kind is not a crime and does not rise to the level of reasonable suspicion needed for an investigative stop.  This initial questioning by Detective Brillos was therefore an illegal seizure as there was absolutely *no* reasonable suspicion that he was involved in any criminal activity. As Detective Brillos testified regarding this episode at the grocery store after being asked if he placed Mr. Gendron under arrest at that time, "[n]o, I have no criminal charges on him."  (S.H. I, p. 13). Brillos even admitted he had not even personally viewed the notebook or conducted any investigation of Mr. Gendron.  *Id.* at p. 35.

The government's argument that this "meeting" was consensual belies the actual events.  Mr. Gendron was told by his manager that the police wanted to speak to him, and immediately led him to the manager's office.  He was informed that he would be paid by the grocery store for the time left on his shift.  *Id.* at p. 11.  Under this situation, and with Detective Brillos waiting in the office,  Mr. Gendron had little choice but to talk with the officer.  Mr. Gendron was behind closed doors for nearly an hour before being driven to his home by Detective Brillos.

12

After Mr. Gendron admitted to owning the handwritten notebook, Detective Brillos quickly changed subjects.  "I state to him that I was wondering if he had any computers located at his house." (S.H. I, p. 17).  There was no mention of child pornography, the detective just casually asked if "he would allow me to go with him to his house and search his house and search the computers located at his house in his control."  *Id.*  At this point Mr. Gendron is in a 10 by 15 foot office at his place of business with the door closed.  His manager had taken him away from his duties at the deli counter, walked him to the manager's office and informed him that he would be paid for the rest of his shift.  *Id.* at p. 11-13.  Between an hour and an hour and a half passed with Mr. Gendron alone with Detective Brillos without the protection of his *Miranda* rights being read, before he allegedly "consents" to have officers go to his residence.

This initial ninety minute detainment was a de facto arrest that continued as he was taken to his home in the officers car.  As a result, all subsequent statements and evidence are inadmissible. The Eighth Circuit has held that exceeding the scope of a *Terry* stop  constitutes a de facto arrest which must be accompanied by probable cause.  *United States v. Bell*, 183 F.3d 746, 749 (8th Cir. 1999).   A de facto arrest occurs when the officers's conduct is more intrusive than necessary for an investigative stop.  *United States v. Jones*, 759 F.2d 633, 643 (8th Cir.  1983). There was not reasonable suspicion for a *Terry* stop in this case, let alone probable cause.  The facts here are very similar to those in *Florida v. Royer*, 460 U.S. 491 (1983).  There the defendant purchased a one-way ticket at the airport.  *Id.* at 491.  Two detectives, who believed the man fit a "drug courier profile," approached the man and requested his driver's license and ticket.  *Id.*  There was a discrepancy in the names and the man explained that a friend had made the reservation for him.  *Id.*  The detectives informed him they were narcotics investigators and asked him to accompany them to a small room.

13

*Id.* Without the man's consent, they retrieved his two checked bags from the airline. *Id.* When they asked for permission to search the bags, the man gave them the key. *Id.* The Supreme Court held that what began as a consensual inquiry in a public place escalated into an investigatory procedure and at that time "any consensual aspects of the encounter had evaporated." *Id.* at 503.

> "In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or of his automobile or other effects. Nor may the police seek to verify their suspicions by means that approach the conditions of arrest."

*Id.* at 499, *citing Dunaway v. New York*, 442 U.S. 200, 207 (1979). In *Dunaway*, the suspect was taken from his home to the police station, and without being formally arrested, he was interrogated for an hour. *Dunaway*, 442 U.S. at 211. The resulting incriminating statements were held inadmissible because even reasonable suspicion of crime is insufficient to justify custodial interrogation even if that questioning is merely investigative. *Id. See also Brown v. Illinois*, 422 U.S. 590 (1975) and *Davis v. Mississippi*, 394 U.S. 721 (1969).

In the present case Mr. Gendron's supervisor took him from his post and escorted him to the manager's office. He was told that he would be paid for the rest of his shift while he talked to police. He was questioned by a detective in a small office, with the door closed, for nearly an hour and a half. He reasonably believed that he was not free to go because not only did his boss escort him to this small office, as requested by the police, he was also escorted by this detective when asked to retrieve his backpack. After doing so he was again escorted back to the manager's office. Added to this scenario is the fact that Mr. Gendron was then driven by the detective to his own home. He did not drive his own vehicle. (S.H. I, p. 18). At this point, if not earlier, Mr. Gendron was not free to leave and was effectively seized for the purpose of the Fourth Amendment. Courts have also held

14

that transporting a suspect to another location or isolating him from others can create an arrest. *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994), *United States v. Rose*, 731 F.2d 1337, 1342 (8th Cir. 1983).  The Supreme Court has consistently held that statements given during this period of illegal detention are inadmissible even though voluntarily given.  *Royer*, 460 U.S. at 501.

Once Detective Brillos and Mr. Gendron arrived at his home, a consent to search form is allegedly signed after they got out of the police car.  (S.H. I, p. 20).   Mr. Gendron had just endured over an hour of questioning by police in a small closed room.  He was driven to his home in a police vehicle.  *Id.* at p. 40.  At his residence there are three other police officers, in three separate vehicles, who accompany Mr. Gendron into his home.  *Id.* at p. 8, 18.  Just as in *Royer*, Mr. Gendron's "consent  was tainted by the illegality and was ineffective to justify the search."  460 U.S. at 508. Absent this consent, police officers unlawfully searched Mr. Gendron's home and illegally seized his computers.  It is important to note that the only witness testifying to witnessesing this consent was Brillos, whose credibility is in serious jeopardy.

Warrantless searches are *per se* unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions.  *Katz v. United States*, 389 U.S. 347, 357 (1967).  One of those exceptions is voluntary consent, which as shown above was not the case in this situation.  Additionally, consent may not be coerced either explicitly or implicitly.  "For no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973).  The Fourth Amendment has drawn a firm line at the entrance to the house.  *Payton v. New York*, 445 U.S. 573, 590 (1980).  Therefore, unless the government can show that the warrantless search was permissible under this "consent" exception to

15

the warrant requirement, the exclusionary rule would bar the admission of evidence obtained from the warrantless search. *See Mapp v. Ohio*, 367 U.S. 643, 648 (1961) and *Weeks v. United States*, 232 U.S. 383, 398 (1914).  Such is the case here because the consent was coerced.  This coercion was both express and implied, invalidating the consent, and therefore the warrantless search of Mr. Gendron's home was unreasonable under the Fourth Amendment.  Even if the court were to conclude the initial questioning was consensual, several additional leaps must be taken before the search of the computers would be deemed admissible.   First, the Court has to find the consent to enter the house was voluntary, a fact only supported by Brillos.  Next the court has to find the consent to look at the computers in the home was voluntary.  It is unclear how many hours into the night it was before officers obtained this consent.  It is clear from the testimony of Jamie and David, the officers were not going to leave until they looked at the computers.  It is also clear they had at least done a cursory search of Gendron's room and equipment before they presented him the form. (S.H. I, p. 28).  Finally, the court must find that the unrecorded verbal consent of Gendron to remove the items from his house some  six hours after this whole ordeal began at his place of work was given freely and voluntarily.  Prior to the removal, officers had not uncovered any child pornography and did not have any evidence to support an arrest.  Mr. Gendron's consent to give a statement also has to be found to be voluntary after the police had been with him for seven hours, handcuffed and arrested his son and removed every piece of computer equipment from his bedroom.

Consent obtained by means of official intimidation or coercion is not consent at all.  *Florida v. Bostick*, 501 U.S. 429, 438 (1991).  A valid consent to search cannot be coerced, by explicit or implicit means.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973).  "No matter how subtly the coercion was applied, the resulting consent would be no more than a pretext for the unjustified police

16

intrusion against which the Fourth Amendment is directed." *Id.*

In determining whether consent was voluntary or coerced, the court considers the totality of the circumstances, including factors relevant to the suspect and the environment in which consent was obtained. *United States v. Griffith*, 533 F.3d 979, 984 (8th Cir. 2008). As to the environment in which consent was given, courts consider whether the suspect was in custody or under arrest, in a public or secluded place, whether police officer detained and question the suspect for a long or short time before obtaining consent, whether they threatened, physically intimidated or punished the suspect, and whether they made promises or misrepresentations on which the suspect relied in giving consent. *Id.* "In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Bustamonte*, 412 U.S. at 218.

In addition to the above components, the Eighth Circuit has recognized that the following three factors should be considered: 1) the temporal proximity between the illegal search or seizure and the consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the official misconduct. *United States v. Yousif*, 308 F.3d 820, 830 (8th Cir. 2002), *citing Brown v. Illinois*, 422 U.S. 590 (1975). Here, Mr. Gendron was first held for nearly ninety minutes in a secluded office. He then allegedly signed a consent form after officers drove him to his house, whereby the officers immediately went inside and began their search. There were no intervening circumstances and the hour and a half long questioning in a small closed office was the beginning of the flagrant misconduct. Therefore under both Supreme Court and Eighth Circuit precedent, the computers seized should be suppressed. *Yousif*, 308 F.3d at 830, *Brown*, 422 U.S. at 592. The fact that officers recovered some unlawful item cannot be used to justify the initial seizure. *United States*

*v. Mendenhall*, 446 U.S. 544, 556 (1980).  If officers do not have a reasonable articulable suspicion

sufficient for the initial detention, which they did not in this case, a subsequent search will be held

unconstitutional even though probable cause may be later established.  *United States v. Escobar*, 389

F.3d 781, 784 (8th Cir. 2004).

       The fruits of an illegal search are subject to exclusion if a Fourth Amendment violation has

taken place.  *Weeks v. United States*, 232 U.S. 383 (1914) and *Terry v. Ohio*, 392 U.S. 1 (1968).

Statements of a defendant are likewise subject to exclusion in the event of a violation.  *Wong Sun*

*v. United States*, 371 U.S. 471 (1963).  After five and a half hours in the home, a detective drove Mr.

Gendron to the police station for further questioning.  (S.H. I, p. 32-33).  He was placed in a eight

by ten police interview room.  *Id.* at p. 72.  This was the first time, after nearly seven hours of police

questioning and searching, that Mr. Gendron was read his *Miranda* rights and made a statement.  *Id.*

at p. 73.  Seven hours that he was constantly surrounded or escorted by police officers.  He did not

drive himself to the police station, he was driven by an officer.  He could not have driven because

his car was still at his place of employment.  Even if *Miranda* rights were given, this warning will

not necessarily break the causal connection between a Fourth Amendment violation and a statement.

*See Brown v. Illinois*, 422 U.S. at 603.  It is the government's burden to prove the consent was

voluntary and was an act of free will sufficient to purge the taint of the illegal seizure.  *United States*

*v. Moreno*, 290 F.3d 898, 900 (8th Cir. 2002).  As stated above, Mr. Gendron was either surrounded

by officers or escorted by one for nearly seven hours before being interrogated for the second, or

possibly third time.  There were no intervening circumstances to purge this taint.  *See Michigan v.*

*Chesternut*, 486 U.S. 567, 573 (1988)(some circumstances which inform our decision making

include officers positioning themselves in a way to limit the person's freedom of movement).

The Supreme Court has found that evidence discovered as a result of a search in violation of the Fourth Amendment must be excluded. *Wong Sun v. United States*, 371 U.S. 471 (1963). This doctrine applies as well when the fruit of the Fourth Amendment violation is a statement or confession. *Oregon v. Elstad*, 470 U.S. 298, 306 (1985). The purpose of this exclusionary rule is to deter unreasonable searches no matter how probative their fruits. *Dunaway*, 442 U.S. at 216. This evidence, obtained in violation of the Fourth Amendment, cannot be used in a criminal proceeding against the victim of an illegal search and seizure. *Weeks v. United States*, 232 U.S. 383 (1914). Therefore both the evidence and subsequent statements in this case should be suppressed.

Respectfully submitted,

/s/Diane L. Dragan
DIANE L. DRAGAN
Assistant Federal Public Defender
1010 Market Street, Suite 200
St. Louis, Missouri 63101
Telephone: (314) 241-1255
Fax: (314) 421-3177
E-mail: Diane_Dragan@fd.org

ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2010 , the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Reginald Harris, Assistant United States Attorney.

/s/Diane L. Dragan
DIANE L. DRAGAN
Assistant Federal Public Defender

19